ENRIQUE OLIVIERI, Plaintiff and Appellee, *v.* LYDIA ESCARTÍN, Defendant and Appellant.

No. 11579. Argued June 11, 1956.—Decided June 29, 1956.

*Gaetán Roberts & Alcalá* for appellant. *José A. Suro* for appellee.

MR. JUSTICE MARRERO delivered the opinion of the Court.

This is an action of divorce on the ground of cruel treatment [1] brought by a husband against his wife. It is alleged in the complaint, substantially, that the defendant has treated plaintiff cruelly, refusing to have sexual intercourse with him, to enjoy marital life, and to fulfill the duties imposed by that institution; that on repeated occasions she has attended different amusement places with third parties; that on December 31, 1954 (sic), the defendant was taken to police headquarters and submitted to an investigation because she was engaged in a heated argument on Ponce de León Ave. with a woman who caught her with her ex-husband; and that from transactions unknown to and altogether unauthorized by plaintiff, the defendant obtained money from several persons. The essential facts of the complaint having been denied and the issue thus joined, the case went to trial at which both parties offered oral evidence in support of their respective contentions. The lower court rendered judgments sustaining the complaint, dissolving the marriage bond existing between the parties, and granting to plaintiff the custody of their two minor daughters. The judgment was based on an opinion in which the following findings of fact are stated:

"1. The parties contracted marriage on April 11, 1943.

"2. They begot two daughters during their marriage, named Migdalia Ailyn and Silma Aixa, aged 9 and 6 years respectively.

"3. Plaintiff was separated from his wife on February 10 of the present year upon learning that she was maintaining relations with one Rocco Perrotta, known as Blackie.

"4. The certainty that such relations were unbecoming the conjugal fidelity arises from the following facts:

"(a) Plaintiff did not know Rocco Perrotta;

"(b) Defendant was seen with Perrotta on December 14, 1953, in an amusement place in Isla Verde;

"(c) On the 31st day of the following January she was also seen with him in his automobile by his recently divorced wife, who followed them in her car;

---

[1] See 31 L.P.R.A. § 321.

"(d) In view of the fact that his ex-wife was apparently following them, he (Perrotta) dropped the defendant at a movie house in Santurce, but they were later seen again by the ex-wife as they came out of a bar; and

"(e) Plaintiff found in one of defendant's handbags an identification plate (of postal employees) which belonged to Perrotta."

The defendant appealed. She now maintains (1) that the lower court erred in holding and concluding that the evidence in this case, as it appears from the record, is sufficient to dissolve the marriage of the parties on the ground of cruel treatment on the part of the wife to the husband, and (2) that the judgment of the lower court is contrary to law. These errors will be discussed jointly.

■■ It has been seen that the lower court made no finding on defendant's refusal to cohabit with plaintiff, nor on the allegation that the defendant obtained money from several persons without her husband's consent, despite the fact that both parties introduced evidence on both questions. The judgment of that court was based exclusively on the relations existing between defendant and one Rocco Perrotta.

According to the text writers, the conduct of a spouse with one of the opposite sex, while not furnishing adequate proof of actual adultery, may appear so persuasive of wrongdoing that the court will find that it amounts to cruel and inhuman treatment, and on the basis of that conduct will decree the divorce. See Schouler, *Divorce Manual*, 1944 ed., § 85(a), p. 112; Keezer, *Marriage and Divorce*, 3d ed. by John W. Morland, § 370, p. 436; Nelson, *Divorce and Annulment*, Vol. 1, 2d ed. (1945), § 6.20, p. 268. In support of the previous statement, these text writers cite the cases of *Tschida* v. *Tschida*, 212 N. W. 193; *Begrow* v. *Begrow*, 127 N. W. 256; *Zumbiel* v. *Zumbiel*, 69 S. W. 708; *Glenn* v. *Glenn*, 146 Pac. 619; *Aitchison* v. *Aitchison*, 68 N. W. 573; *Craig* v. *Craig*, 105 N. W. 446; *Farley* v. *Farley*, 270 N. W. 711; *Holmes* v. *Holmes*, 23 So. 324; *Lowe* v. *Lowe*, 25 A. 2d

781; *Hannon* v. *Hannon*, 284 N. W. 499; *Baldwin* v. *Baldwin*, 9 So. 2d 717; and *Bearinger* v. *Bearinger*, 136 N. W. 1117. We agree with this principle. However, we have examined the afore-cited cases and there the evidence was stronger and more persuasive than in the case at bar.

In *Morales* v. *Vélez*, 75 P.R.R. 901, 908, we stated:

"We have decided that 'ordinary evidence is not sufficient to break a bond which is the foundation of a fundamental social institution, on the ground of cruel treatment and grave injury,' *Manich* v. *Quero, supra,* it being a well-settled rule and traditionally recognized in law that *the spouse seeking a divorce on the latter ground has the burden of producing a preponderance of the evidence and making a clear and satisfactory showing. Manich* v. *Quero, supra; Hanireu* v. *Hanireu,* 26 A. 2d 381, 383 (Md.); *Jacobson* v. *Jacobson,* 36 A. 2d 189, 190, (Pa.). *Acts of cruelty or indignities must be shown,* and it is not enough to support the burden of proof to introduce testimony of witnesses who give their conclusions in that regard or have them testify merely in general terms. Nelson, *Divorce and Annulment,* 2d ed., pp. 292, 293; *Walldren* v. *Walldren,* 63 S. W. 2d 845, 847 (Ark.); *De Lisi* v. *De Lisi, supra; Esenwein* v. *Esenwein,* 167 A. 350, 351 (Pa.); *Edmond's Appeal, supra.*

"Marriage may be dissolved by one of the grounds prescribed by the Civil Code. The state does not compel anybody to cohabit if there is a legal ground for divorce, but if the remedy is sought, *he who desires it has the burden of introducing evidence to prove the ground that he invokes, which if believed by the judge, has the legal effect of establishing the ground. . . .*" (Italics ours.)

Regarding the evidence which must be introduced in divorce cases on the ground of cruel treatment, this Court expressed a similar view in *Marques* v. *Rivera,* 68 P.R.R. 666, 669; *Delgado* v. *Mercado,* 60 P.R.R. 571; *Gómez* v. *Trujillo,* 59 P.R.R. 470; *Manich* v. *Quero,* 38 P.R.R. 83; and *Figueroa* v. *Pierluisi,* 25 P.R.R. 460.

■ Was the evidence in this case as strong and persuasive as is required by the afore-cited decisions, and does it show that the wife's conduct toward her friend Rocco Perrotta is such as to warrant a divorce in favor of plain-

tiff? We think not. We are so convinced after carefully examining the testimony introduced in the lower court and the findings of fact made in support of its judgment. The judgment is based solely on finding No. 4 copied above. That finding is subdivided into paragraphs *a*, *b*, *c*, *d*, and *e*. Let us analyze the evidence which the trial court had before it in connection with each of the paragraphs of that finding.

(*a*) *Plaintiff did not know Rocco Perrotta.* The lower court erred in this conclusion, since the evidence clearly shows that plaintiff met Perrotta at a party in the Esquife night club which followed the wedding of defendant's brother, which was attended by plaintiff as well as by Perrotta, the defendant, and other persons. (Tr. Ev. 45, 48, 49.)

(*b*) *The defendant was seen with Perrotta on December 14, 1953, in an amusement place in Isla Verde.* Witness Rosita Brugueras, at that time the wife of Perrotta, and whom she divorced a few days later, testified on this point. Her testimony in this connection was, in brief: that on December 14 she saw the defendant, Perrotta, two other men, and a young girl come out in an automobile from the Guadalquivir amusement place in Isla Verde; that the defendant was seated next to Perrotta; that the automobile did not belong to the latter; that she followed them in her car but could not overtake them; and that this took place shortly after 5 p.m. of that day. (Tr. Ev. 61, 65.)

(*c*) *On the 31st day of the following January she was also seen with him [Perrotta] in his automobile by his recently divorced wife, who followed them in her car.* Rosita Brugueras testified in this connection.[2] (Tr. Ev. 58, 65.)

---

[2] In this connection, the defendant testified:
"Between two-thirty and three I left for the movies. While waiting at the bus stop, Mr. Perrotta went by in his car . . . and when he saw me, he stopped the car and as a friend of the house, of my family, he asked me where I was going. I said I was going to the Metro . . . He told me that if he could first go to the Condado to express his condolence to a friend, he would drop me at the movies. I looked at the time and told him it was all right. He took me to the Metro . . . When we

510

(d) *In view of the fact that his ex-wife was apparently following them, he [Perrotta] dropped the defendant at a movie house in Santurce, but they were later seen again by the ex-wife as they came out of a bar.* Regarding the first part of this paragraph, we have already said that Mrs. Brugueras saw Perrotta drop the defendant in front of the Metro theater. —This took place between two and three o'clock on Sunday afternoon. —This witness also testified that on the same day, about 7 p. m., she saw the defendant and Perrotta come out of Arnie's Bar across from the Metro; that she immediately parked her car and said something to the defendant; that a police officer arrived in a jeep and took her and the defendant to headquarters, where they were released shortly thereafter.[3]   (Tr. Ev. 58, 59.)

(e) *Plaintiff found in one of defendant's handbags an identification plate (of postal employees) which belonged to Perrotta.* Plaintiff Olivieri as well as Rosita Brugueras testified in this connection.[4]

After analyzing the evidence on which the foregoing findings of the lower court were based, we find the following: (1) the defendant was seen in an automobile in which five persons in all were riding, and she was seated next to Perrotta; (2) she was seen on another occasion as she alighted from Perrotta's automobile in front of the Metro in Santurce; (3) she was seen coming out of a bar, or in front of a bar, about 7 o'clock in the evening of the same

---

stopped at the Metro, Rosa Brugueras stopped behind the car and made a few remarks to a woman with green eyes. Then I crossed the street and went into the Metro . . . I arrived at the movies at 3:15 . . . more or less . . ."   (Tr. Ev. 129, 130.)

[3] Regarding the incident, the defendant testified that as soon as she saw the picture she came out of the Metro and crossed the street in order to go to the Professional Building on De Diego Avenue, where her sister-in-law was confined; that after crossing she met Rocco Perrotta, who was passing by; that they did not go into Arnie's Bar; and that Rosita Brugueras arrived while she was there, at the stop. She also admitted the incident with Rosita Brugueras at the stop and the fact that both were taken to police headquarters.   (Tr. Ev. 134, 135, 138, 139.)

[4] On this incident, the defendant testified that one of her little girls found the plate in her house.   (Tr. Ev. 155.)

day; and (4) plaintiff found in defendant's handbag an identification plate of Rocco Perrotta. Accepting as correct, as we must do, because there is evidence in support thereof, each and every one of the foregoing findings (with the exception, as already noted, of the finding relative to the fact that plaintiff did not know Perrotta), we ask ourselves again, is the evidence believed by the lower court sufficient at law to declare broken and dissolved the matrimonial bond existing between plaintiff and defendant on the ground of cruel treatment? Again we think not. As in the *Delgado* case, *supra*, (p. 580), we say: "We do not mean to say that defendant's behaviour is praiseworthy. It is not the sort of conduct to be imitated, because of its many shortcomings." Yet, we cannot conclude that her conduct amounts to the strong and persuasive evidence required by our decisions in cases of this nature.

The judgment will be reversed and the complaint is dismissed.

Mr. Justice Negrón Fernández did not participate herein.

Mr. Justice Belaval concurs in the result.

Mr. Justice Saldaña dissented.